UNITED STATES OF AMERICA,              )
                                       )
      Plaintiff,              )
                                       )
      vs.              )      Case No. 1:07CR170ERW(MLM)
                                       )
ELTON LLOYD STONER,              )
                                       )
      Defendant.              )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

On January 11, 2008 this matter came before the court for an Evidentiary Hearing on defendant's Motion to Suppress Statements. [Doc. 21] The government responded in writing. [Doc.22]

At the Hearing the government presented the testimony of Alvin Marcum. The defendant did not present witnesses. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Alvin Marcum testified that at the present time he is self employed and serves as a reserve deputy in the Mississippi County Sheriff's Department. On 5/27/07 he was a full time deputy with the Mississippi County Sheriff's Department. On 5/27/07 Deputy Marcum received a call from a family member of defendant's wife. He later learned that the call came from Mrs. Stoner's father, Randy Cave. The caller asked that the deputy check on the well being of Mrs. Stoner. Deputy Marcum knew the location of the Stoner residence outside of Charleston, Missouri. He had had contact with defendant on previous occasions

when he responded to the residence for a disturbance. On one occasion, a few months prior to 5/27/07, defendant and his father had argued and Deputy Marcum detained defendant because of verbal threats against his father.

As Deputy Marcum was responding to the residence he received another phone call from defendant's neighbors who wished to remain anonymous at the time. They had called the Sheriff's Department and the information was radioed to Deputy Marcum. The caller said that there was a disturbance at the Stoner residence with much yelling and screaming. The call from Mrs. Stoner's father and the neighbors came approximately twenty minutes apart. Deputy Marcum was heading to the Stoner residence when he received the second call.

Deputy Marcum was the only deputy on duty but pursuant to procedure, he picked up off-duty Deputy Randy Cook to respond to the disturbance with him. The neighborhood in which the Stoner residence is located is a trailer court and the Stoner residence is a single wide modular home. When the deputies arrived a male and female standing at the front door waived the deputies in. They acted as if there was urgency or there was an emergency, described by Deputy Marcum as a "life or death situation." The couple did not say anything to Deputy Marcum at that time. He did not know who they were when he arrived and later learned that they were Lewis Achter and Danielle Adams who have a child together.

The deputies entered the residence and the two individuals at the front door pointed to the bedroom. Deputy Marcum could hear a female sobbing and could hear the sound of someone vomiting. He could also hear much shouting by both a male and a female. From the front door to the bedroom is approximately 15-20 feet. Deputy Marcum went to the bedroom and observed the bathroom on the left. As he rounded the corner he saw the

female in the bathroom. Her face was red and streaked with tears. He saw a male kneeling down vomiting into the toilet.

Deputy Marcum asked if everything was okay. He recognized defendant from his previous contacts but did not know Mrs. Stoner personally. Defendant became irate when Deputy Marcum asked if everything was okay and wanted to know what "I was f_ _ _ing doing in his house." Deputy Marcum testified defendant was so drunk that they believed he should be detained for his own safety. For his own safety and the safety of Deputy Cook, Deputy Marcum asked if there were any weapons in the home. Defendant responded that there were some large sword-like knives in the closet. There was no door on the closet. Deputy Marcum shone his flashlight into the closet and observed a chrome handled handgun in a clear Tupperware container. He nodded to Deputy Cook to alert him not to make the situation worse. Deputy Marcum asked again if there were any other weapons and defendant said "No." Deputy Cook responded to defendant while Deputy Marcum retrieved the gun and put it on the bed. The gun was a loaded Derringer pistol. Defendant spontaneously said the gun was not his but it belonged to "Greg" and then lunged towards the bed reaching for the gun. The deputies "took him down," handcuffed him and placed him under arrest. He was not advised of his Miranda rights and made no other statements at that time.

After detaining defendant, Deputy Marcum asked Mrs. Stoner if defendant needed any medication because he was aware of defendant's mental problems from speaking with defendant's father on an earlier occasion. Mrs. Stoner obtained the medication for defendant. Deputy Marcum asked her if there were any other drugs in the house and she retrieved a container containing marijuana residue. When Deputy Cook put defendant in Deputy Marcum's patrol car there was a confrontation at which time defendant told Deputy

Cook he was going to kill him.  Defendant was taken to the Mississippi County jail and booked.

## CONCLUSIONS OF LAW

After concluding that defendant was so drunk he needed to be detained for his own safety, Deputy Marcum asked if there were any weapons in the house for his safety and the safety of Deputy Cook, Mrs. Stoner, Lewis Achter and Danielle Adams.  Defendant responded that there were sword-like knives in the closet.  The defendant made this statement prior to being advised of his rights pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  <u>Miranda</u> warnings must be given when the defendant is both in custody and subjected to interrogation.  <u>Id.</u>

Although it is arguable whether defendant was actually in custody at that time, for purposes of this discussion, the court will assume, *arguendo*, that he was.

An exception to the exclusionary rule was carved out by the Court in <u>New York v. Quarels</u>, 467 U.S. 649 (1984).  Even if the elements of custodial interrogation are present, the Court held that <u>Miranda</u> warnings are not required when swiftly developing circumstances threaten public safety.  In <u>Quarels</u>, a man arrested in a supermarket was wearing an empty shoulder holster.  The police asked him where his gun was without giving <u>Miranda</u> warnings.  <u>Quarels</u>, 467 U.S. at 655-56.  The Court held that the police may ask questions reasonably prompted by considerations of public safety without violating <u>Miranda</u>.  <u>Id.</u>  <u>See</u> <u>also</u>  <u>United States v. Luker</u>, 395 F.3d 830, 834 (8th Cir. 2005) (holding defendant's response to officers' questions regarding whether there was anything in the vehicle that officers should know about was within the public safety exception to <u>Miranda</u>); <u>United States v. Williams</u>, 181 F.3d 945, 953 (8th Cir. 1999) (holding defendant's statement that there was a gun in the closet in response to officers' questions whether there was

anything police should be aware of was within public safety exception); <u>United States v.</u> <u>Knox</u>, 950 F.2d 516, 519 (8th Cir. 1991) (response to police question about gun given before <u>Miranda</u> warnings is admissible under public safety exception because of necessity to locate gun to eliminate danger to police and others). The present situation is analogous. Defendant's response to Deputy Marcum's question whether there were any weapons in the house should be admissible under the public safety exception.

Defendant made other statements, specifically, "What are you f_ _ _ing doing in my house?" and saying the gun was not his, it was Greg's, and telling Deputy Cook he was going to kill him. None of these statements were in response to questioning by the deputies. These statements were spontaneous and volunteered.

Custodial interrogation means questioning initiated by law enforcement officers after a person has been deprived of his freedom of action in some significant way. <u>Miranda</u> <u>v. Arizona</u>, 384 U.S. 436, 467-73 (1966). The proscription of <u>Miranda</u> applies *only* to questioning initiated by police officers. <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980). A spontaneous statement by a person in custody does not warrant suppression. <u>United States</u> <u>v. McCoy</u>, 200 F.3d 582, 584 (8th Cir. 2000) (<u>Miranda</u> not applicable because defendant's statement was spontaneous and not in response to questioning by officer).

In fact, "the Supreme court in <u>Miranda</u> expressly stated that '[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admission is not affected by our holding today.'" <u>United States v. Butzin</u>, 886 F.2d 1016, 1018 (8th Cir. 1989) <u>quoting</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966). Defendant's other post-detention statements should not be suppressed because they were spontaneous and volunteered.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Statements be **DENIED**. [Doc. 21]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
**MARY ANN L. MEDLER**
**UNITED STATES MAGISTRATE JUDGE**

Dated this  **22nd**  day of  January, 2008.